IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 19, 2004 Session

## J. HOWARD JOHNSON, ET AL. v. MICHAEL R. ALLISON, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 02-3101-II     Carol McCoy, Chancellor**

---

**No. M2003-00428-COA-R3-CV - Filed October 7, 2004**

---

The parties entered into an option contract for the sale and purchase of a piece of land. The bargained-for option had a limited duration, with the buyer entitled to extend the option for additional consideration if it exercised that right within an agreed-upon time frame. The buyer paid for several extensions, but did not exercise the option before the final option deadline had passed. The sellers subsequently refused to sell, and the buyer sued for breach of contract and specific performance. The sellers filed a motion for summary judgment, which the trial court granted. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., JJ., joined.

Joseph L. Lackey, Jr., Nashville, Tennessee, for the appellants, J. Howard Johnson, George W. Holder, Jr., individually and/or As Attorney-In-Fact for Wesley Holder, III, and Robert F. Lance, all d/b/a Gateway Development.

Kenneth L. Campbell, Nashville, Tennessee, for the appellees, Michael R. Allison and Diane A. Allison.

### OPINION

### I. AN OPTION TO PURCHASE

The disputed property is a 265 acre tract of land in southwestern Davidson County. The owners and defendants, Michael Allison and Diane Allison, had been using a portion of the tract for their sod production business. Two hundred acres of the property was zoned AR-2 (agricultural use), and the remainder was zoned CS (commercial/light industrial). At some point, the Allisons ("Sellers") decided to sell their land.

The three individual plaintiffs, J. Howard Johnson, George W. Holder Jr., and Robert F. Lance decided to buy the Allisons' land and to create a residential development on it. They formed a limited liability company, Gateway LLC, ("Buyer") to accomplish their purpose. They understood that in order for their plans to succeed, they would have to get the zoning of the land changed.

On February 20, 2001, the Buyer and the Sellers entered into an "Agreement for Purchase of Real Property," ("Initial Contract") whereby the Buyer obtained an option of limited duration to purchase the property for $2,600,000. The contract also granted the Buyer the right to pursue re-zoning of the property while the option was in effect and obligated the Sellers to cooperate in such re-zoning.

The Buyer paid $3,000 to make the option available until March 14, 2001. The initial payment, and any subsequent payments, were to be put into an escrow account and credited to the purchase price if the sale closed. The Buyer was permitted to extend the option deadline for one month at a time, by paying $5,000 for each such extension, but only for a limited number of months. One section of the contract stated, "Time is of the essence of this agreement." October 14, 2001 was designated in the contract as the "Final Option Deadline." An additional provision for extensions to this deadline was included in Section 2(a) of the Initial Contract:

> Notwithstanding the foregoing, if the Buyer has diligently pursued approval by the Metropolitan Planning Commission of a final subdivision plat for the approximately 200 Acre portion of the property presently zoned AR-2 (hereinafter referred to as the "Plat Approval") and if the Buyer has not received the Plat Approval by October 14, 2001, then the Buyer may elect to further extend the Option Deadline until November 14, 2001; similarly, the Buyer may elect to further extend the Option Deadline for two more monthly periods, if the Plat Approval is not received prior to the Option Deadline as previously extended. Each of the foregoing three extensions for the Plat Approval will be elected by depositing with the Escrow Agent, on or before the Option Deadline then in effect, additional Option Money of $5,000 for each such extension . . .

The practical result of this provision was to make January 14, 2002 the new de facto final option deadline. The contract further provided that the Option was to be exercised by the Buyer giving the Sellers notice of its intent to purchase and depositing with the escrow agent an additional option payment of $50,000.

The process of changing the zoning proved to be more time-consuming and complicated than the Buyer had anticipated. As a result, the Buyer asked the Sellers for an additional extension to the option period. On December 21, 2001, the parties entered into a "First Amendment to the Agreement for Purchase of Real Property." ("Amended Contract"). This agreement specifically allowed for nine (instead of three) monthly extensions to the original Option Deadline of October 14, 2001, but with the price of each monthly extension after the third extension set at $10,000 instead of $5,000.

Further, the option money from the additional six extensions was to be paid directly to the Sellers instead of being placed in escrow, and would not be credited against the purchase price. An additional provision was that if the Buyer did not exercise the option by January 3, 2002, $53,000 would be withdrawn from the escrow account, and paid directly to the Allisons. Of that sum, $50,000 was to be credited against the purchase price.[1]

Despite the deadline extensions, George Holder remained concerned that the zoning change would still not be completed before the option expired. He spoke about those concerns several times with David Wilson, Director of Properties for the Allisons' real estate agent.

On February 26, 2002, Mr. Wilson sent Mr. Holder a letter stating that he and Mike Allison had met with the Metro Councilman in whose district the subject property was located. The letter disclosed that the councilman's schedule left insufficient time for the zoning process to be completed prior to the expiration of the option contract.

The letter also stated that Mr. Allison would consider a further extension of the contract under two conditions: (1) the submission of a specific plan (PUD or UDO) to the planning commission, to Carter & Associates, and to the councilman prior to May 1, 2002, for their comments, and (2) documentation showing evidence of sufficient funds to close the transaction upon the zoning bill passing second reading.

The Buyer relies heavily on a second letter from David Wilson to George Holder, dated April 23, 2002. It begins, "[d]uring our recent discussions, you requested clarification regarding the term length for a contract extension beyond July 14, 2002." It then summarizes the earlier letter, notes that the revised development plan has been submitted to the planning commission, and states that "[t]he requested financial information may be provided anytime prior to May 3, 2002." The letter also states that "we feel it would be in everyone's best interest to provide you with an extra month or two beyond July to finalize and close the transaction," and "[i]n the event that rezoning is postponed or delayed beyond July, Mike may consider an additional contract extension."

Below the closing and Mr. Wilson's signature, the following sentence appears in italic type:

*This letter is for information and discussion purposes only and is not intended to be an offer to extend the contract. Any extension must be agreed upon in writing by both the Buyer and Sellers.*

The Buyer did not furnish the Sellers with the financial information by May 3, as requested in Mr. Wilson's letter. The zoning change passed its second reading on July 16. Earlier that same day, however, plaintiff Howard Johnson had gone on the property to get some information for the councilman. While he was on the property, Mike Allison asked Mr. Johnson, "you realize you no longer have a contract?"

---

[1]The appellants' brief erroneously states that the $50,000 was <u>not</u> to be applied to the purchase price.

The Buyer had tendered a $10,000 check to the defendants on July 12 with the intention of extending the option period to August 14. The Sellers accepted the check at that time, but did not cash it. By the week of July 23, the Buyer had finally gotten all the necessary financing arranged and met with David Wilson to advise him of that fact. Mr. Wilson refused to give them a contract, and he subsequently returned the check of July 12. On August 14, George Holder offered another $10,000 check for the August extension, but Mr. Wilson told him it would not be accepted. The rezoning passed its third reading on August 20, and was signed by the Mayor on August 21.

## II. COURT PROCEEDINGS

Gateway Development filed a Complaint for breach of contract in the Davidson County Chancery Court on October 17, 2002.[2] The Complaint recited that the Buyer had spent in excess of $234,000 for option payments, engineering and other expenses in an effort to get the property rezoned, that the zoning change inured to the benefit of the Sellers, and asserted that the Buyer was entitled to specific performance of the option contract.

The Buyer advanced two theories to support the claim: first, that the option period did not end until some time in August of 2002; second, that even if the option expired on July 15, 2002, the defendants should be estopped from so asserting because they had impliedly promised the plaintiffs an extension of the option deadline until the property was rezoned. The Sellers responded with an Answer and a Counter-Complaint, asking for a Declaratory Judgment that the option agreement was unenforceable or had expired. They subsequently filed a Motion for Summary Judgment.

After a hearing on the Motion, the trial court granted summary judgment to the Sellers. In its judgment of January 14, 2003, the court specifically held that the final option deadline was July 15, 2002, and that the plaintiffs did not exercise the option in the manner required by the contract by giving notice to the defendants and depositing $50,000 with the escrow agents before that date. This appeal followed.

## III. SUMMARY JUDGMENT AND CONTRACT PRINCIPLES

Summary judgment is only appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *McCarley v. West Quality Food Services,* 960 S.W.2d 585, 588 (Tenn. 1998); *Byrd v. Hall,* 847 S.W.2d 208, 211 (Tenn.1993); Tenn. R. Civ. P. 56.04.

In this case, there is no dispute as to the operative facts: that is, as to the sequence of events that occurred during the ongoing dealings between the parties. Insofar as there is a dispute as to the date on which the option expired, that is a matter of contract interpretation, and therefore a question

---

[2]An Agreed Order filed on January 6, 2003 replaced Gateway Development, Inc. as the sole named plaintiff with J. Howard Johnson, George W. Holder Jr., individually and/or as attorney-in-fact for Wesley Holder III, and Robert F. Lance, d/b/a Gateway Development, Inc.

of law rather than a material question of fact such as would preclude summary judgment. *See Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002); *Doe v. HCA Health Services of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001). Our review of the trial court's legal conclusions is de novo, with no presumption of correctness accorded to its judgment. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn.1997).

It is well-established that "[t]he cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." *Pearsall Motors Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975); *see also Planters Gin Co.*, 78 S.W.3d at 889-890; *Galleria Associates, L.P. v. Mogk*, 34 S.W.3d 874, 876-77 (Tenn. Ct. App. 2000).

The intention of the parties is derived from the language of the contract itself. When interpreting contracts, the courts should give each term its usual, natural and ordinary meaning. *Planters Gin Co.*, 78 S.W.3d at 889-890*; Evco Corp. v. Ross*, 528 S.W.2d 20, 23 (Tenn.1975); *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 597 (Tenn. Ct. App. 1999).

The courts should avoid strained constructions which create ambiguities where none actually exist. *Planters Gin Co.*, 78 S.W.3d at 891; *Hillsboro Plaza Enterprises v. Moon*, 860 S.W.2d 45, 47-48 (Tenn. Ct. App. 1993). If the contract is unambiguous, then the court may not look beyond its four corners to ascertain the parties' intentions. *Rogers v. First Tennessee Bank National Ass'n*, 738 S.W.2d 635, 637 (Tenn. Ct. App. 1987); *Bokor v. Holder*, 722 S.W.2d 676, 679 (Tenn. Ct. App. 1986).

## IV. ISSUES ON APPEAL

### A. THE FINAL OPTION DATE

The Buyer note that both the original contract and the amended agreement contain clauses stating that the "effective date" of each agreement would be "the date the last of Buyer and Sellers have executed this agreement." Since the Amended Agreement was signed by the Sellers and delivered to the Buyer on December 26, 2001, the Buyer contends that the final option deadline should be eight months later, or August 26, 2002.[3] In the alternative, they argue that at the very least, the contract contains an ambiguity as to the final date the option could be exercised.

The language of both contracts makes clear, however, that there is no connection between the effective date of the contract and the final option deadline. The effective date of the Initial Contract functions as the starting point to determine the date for the Buyer's obligation to deposit the option money with the Escrow Agent ("within 5 business days from the effective date of this

---

[3]The Buyer argued in separate documents that the effective date was December 26 and also that it was December 31. The inconsistency apparently arose from confusion about the effect they wished to attribute to the five-day interval after signing when the first option payment became due.

Agreement"), and to conduct a survey of the property ("within 90 days from the Effective Date"). Under the Amended Contract, the Buyer's obligation to deposit the option money with the Escrow Agent is also stated to be within 5 business days from its effective date.

The contract language referring to the final option date is complex, but it is not ambiguous. A final option date of October 14, 2001 is specified in the Initial Contract, with three possible extensions from that date measured in one month intervals. The Amended section 2(a) of the Contract increases the number of possible extensions as follows:

> However, the Buyer can extend the Option Deadline for one month by depositing directly with the Escrow Agent, on or before March 14, 2001, additional Option Money of $5,000.00. If the Buyer elects the foregoing first extension of the Option Deadline, then the Buyer may elect to further extend the Option Deadline for six successive monthly periods by depositing with the Escrow Agent, on or before the Option Deadline then in effect, additional Option Money of $5,000.00 for each such extension, so that if all of the extensions are elected, the final Option Deadline is October 14, 2001. Notwithstanding the foregoing, if the Buyer has diligently pursued approval by the Metropolitan Planning Commission of the final subdivision plat for the approximately 200 acre portion presently zoned AR-2 (hereinafter referred to as the Plat Approval) and if the Buyer has not received the Plat Approval by October 14, 2001, then the Buyer may elect to further extend the Option Deadline until November 14, 2001: similarly, the Buyer may elect to further extend the Option Deadline for **eight** more monthly periods, if the Plat Approval is not received prior to the Option Deadline as previously extended. Each of the foregoing **nine** extensions for the Plat Approval will be elected by depositing with the Escrow Agent, on or before the Option Deadline then in effect, additional Option Money of $5,000.00 for each such extension.

Although it refers in one sentence to "eight more monthly periods," and in another to "the foregoing nine extensions," there is no ambiguity, because the nine extensions are clearly meant to be measured from the initial final option deadline of October 14, 2001, and the eight additional monthly periods are specified to extend from November 14, 2001, the date of the first option extension.

To sum up, the initial contract recited a final option deadline of October 14, 2001, but allowed for three additional extensions to bring the actual deadline date to January 14, 2002. The amendment of December 26, 2001 added another six extensions, indicating a new final deadline date of July 14, 2002. Since that date fell on a Sunday, the clause of the contract relating to computation of time advances the actual deadline to the next business day, July 15, 2002. The Buyer have attempted to find an ambiguity by linking unrelated provisions of the contract together, resulting in what can only be characterized as a strained construction. The carefully worded clauses which refer to the option deadlines are not at all ambiguous.

Consequently, the Buyer's option expired July 15, 2002. No further extension was negotiated or agreed upon. Further, Buyer did not exercise the option prior to its expiration.

## B. "TIME IS OF THE ESSENCE"

In an ordinary contract to purchase real property, the inability of a party to close on the date recited in the contract is not considered to be a material breach of the contract. The general rule is that time is not of the essence in a real estate sales contract, unless the contract specifies otherwise. *Hillard v. Franklin,* 41 S.W.3d 106, 113 (Tenn. Ct. App. 2000); *Lewis v. Muchmore,* 26 S.W.3d 632, 639 (Tenn. Ct. App. 2000).

The rule is the exact opposite for option contracts. Unlike a contract of sale, an option contract is a unilateral contract, "which acts as a continuing offer, given for consideration, to purchase or lease property at an agreed upon price and terms, *within a specified time*." (emphasis added). BLACK'S LAW DICTIONARY (5th ed. 1979). Thus, "The rule is uniform that both at law and in equity, time is of the essence of an option contract. The rule is necessary from the very nature of the contract itself." *Ray v. Thomas*, 232 S.W.2d 32, 34 (Tenn. 1950)(citing WILLISTON ON CONTRACTS § 853; 17 C.J.S. *Contracts* § 504 at 1072). *See also Allen v. National Advertising Co.*, 798 S.W.2d 766, 768 (Tenn. Ct. App. 1990).

There was therefore no need for the parties to include, as they did, the phrase "time is of the essence" in their contract, since the contract, by its nature, already included that provision. Obviously, harsh results may sometimes follow when a party is at risk for losing all its rights by failing to act in a timely fashion. This is especially likely in cases like the present one, where the optionee had difficulty establishing the financial and regulatory conditions necessary to exercise the option.

In this appeal, the Buyer has focused almost entirely on the problems it encountered in trying to change the zoning within the time permitted by the option, a matter that ultimately proved to be beyond its control. We note, however, that the contract did not make a change in zoning a condition for the Buyer's exercise of the option. The Buyer was permitted to pursue re-zoning of the property under the contract (and was promised the Sellers' cooperation in that endeavor), but was not required to do so.

The Buyer argues otherwise, contending that the contract allowed the Sellers to decline to close during the option period if the re-zoning was not accomplished. But a fair reading of the contract shows this not to be the case. While the Buyer's difficulties with zoning and financing were unfortunate, there was nothing in the contract itself that would have prevented it from purchasing the property at any time prior to the final option deadline.

## C. ESTOPPEL

The Statute of Frauds requires any contract for the sale of real property to be in writing in order to be enforceable. Tenn. Code Ann. § 29-2-101(4). This includes contracts which grant a party an option to purchase such property.[4] *Anderson v. Hacks Crossing Partners*, 3 S.W.3d 482, 485 (Tenn. Ct. App. 1999); *GRW Enterprises, Inc. v. Davis*, 797 S.W.2d 606, 612 n.6 (Tenn. Ct. App. 1990). It is undisputed that the parties did not enter into a written agreement to extend the option beyond the date set out in the Amended Contract.

The Buyer seeks to avoid the operation of the Statute of Frauds by relying on the defense of equitable estoppel. It argues that the Sellers should not be allowed to rely on the July 15, 2002 deadline for exercising the option, because of assurances made by the Sellers' agent which led the Buyer to believe that the deadline had been or would be extended. The elements that must be proven to establish equitable estoppel as a defense to the exercise of a legal right are well established.

> The doctrine of equitable estoppel requires evidence of the following elements with respect to the party against whom estoppel is asserted:
>
> > (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; (3) Knowledge, actual or constructive of the real facts.
>
> Equitable estoppel also requires the following elements with respect to the party asserting estoppel:
>
> > (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) Reliance upon the conduct of the party estopped; and (3) Action based thereon of such a character as to change his position prejudicially.

*Osborne v. Mountain Life Ins. Co*, 130 S.W.3d 769, 774 (Tenn. 2004) (citations omitted). *See also Roach v. Renfro*, 989 S.W.2d 335, 339 (Tenn. Ct. App. 1998)

It is the burden of the party seeing to invoke estoppel to prove each and every one of its elements. *Bokor*, 722 S.W.2d at 680; *Third National Bank v. Capitol Records, Inc.,* 445 S.W.2d 471, 476 (Tenn. Ct. App. 1969). We note that in this case, the Buyer does not allege concealment or false representations of material facts. The Buyer had the same access to the facts as did the

---

[4]Additionally, the Initial Contract itself states that "[n]o provisions of this Agreement may be amended or added to except by agreement in writing signed by the parties or their respective successors in interest."

Sellers, and does not assert that the Sellers misled it as to the prospects for timely completion of the rezoning process. The Buyer complains, rather, that the Sellers' agent made representations that led it to believe that the final option deadline would either be extended or waived.

While it appears that the Buyer may indeed have relied to its detriment upon certain statements made by Mr. Wilson, it did so despite other statements made simultaneously by the agent, which at the very least should have made it aware of the necessity for caution. The evidence also shows that the Buyer knew that Mr. Wilson did not have the authority to bind the Sellers, and that the Sellers would not necessarily agree to another extension of the option.

The Buyer cites as the basis for his argument an oral statement by Mr. Wilson, and the agent's letter of April 23, 2002. The Buyer claims that in an April 2002 meeting, Mr. Holder and Mr. Johnson asked Mr. Wilson for an extension just in case the matter did not go through planning, zoning and plat approval within the contract time. Mr. Wilson allegedly said, "I will not agree to that, but you do not have to worry about this as long as the zoning is proceeding. You're dealing with honorable and ethical people and we will do what is right."

Regardless of the accuracy of the above characterization, it was not reasonable for the Buyer not to insist on a new extension before proceeding further. Mr. Wilson's letter of April 23, 2002 states in part,

> In the event that rezoning is postponed or delayed beyond July, Mike may consider an additional contract extension, however the transaction must be closed prior to the next scheduled seasonal planting of the sod crop (end of September to mid October contingent upon weather conditions) regardless of the property's zoning status.

We note that while the letter holds out the possibility of an option extension ("Mike may consider an additional extension..."), it does not promise any such extension. Further, as we stated above, the bottom of the letter also recites, "[t]his letter is for information and discussion purposes only and is **not intended to be an offer to extend the contract. Any extension must be agreed upon in writing by both the Buyer and Sellers.**"

The proof indicates that all parties were experienced businesspeople who were negotiating at arms' length. The Buyer was represented by an attorney. The equivocal representations by the Sellers' agent should not have led an experienced businessperson to assume that a contract deadline could be safely ignored. Apparently, the Buyer never made an effort to obtain another extension in writing as the letter suggested. Further, the Buyer could have protected its interest by taking action before July 15 to comply with the contract as written by "(a) giving notice to the Sellers of the Buyer's intent to purchase and (b) depositing with the Escrow Agent an additional Option Payment of $50,000.00."

Our courts have stated on numerous occasions that estoppel is not favored under our law. *Sturkie v. Bottoms*, 310 S.W.2d 451, 453 (Tenn. 1958); *Moore v. Carter*, 277 S.W.2d 427, 431 (Tenn. 1954); *York v. Vulcan Materials Co.*, 63 S.W.3d 384, 388 (Tenn. Ct. App. 2001); *Grant v. Prograis*, 979 S.W.2d 594, 602 (Tenn. Ct. App. 1997); *State ex rel. Sexton v. Sevier County,* 948 S.W.2d 747, 750 (Tenn. Ct. App.1997). Since the application of promissory estoppel in contract cases creates an exception to the Statute of Frauds, it should not be applied too liberally lest the exception swallow the rule. *See Shedd v. Gaylord Entertainment Co.*, 118 S.W.3d 695, 698 (Tenn. Ct. App. 2003).

The Buyer relies on the case of *GRW Enterprises, Inc.*, 797 S.W.2d 606. In that case, this court ordered specific performance of an option contract, despite the fact that the final deadline date recited in the written contract was December 15, 1987, and the optionee did not attempt to exercise the option until December 22, 1987.

While the above-described fact pattern appears at first glance to present a situation similar to the one before us, a deeper look reveals important distinctions between the two cases. The reason for our apparent deviation from the strict application of the deadline in *GRW* had to do with events that occurred at the time the parties negotiated their contract. The proof showed that from the very beginning of their negotiations, the parties intended the option to run for ninety days after the option was executed.

The parties drafted a contract, but delayed its execution. They then agreed to revise the contract so its dates would coincide with the dates of a another option contract, between the plaintiff and the Gulf Oil Company, which wished to become the ultimate owner of the property. The parties accordingly added interlineations and initials to the unexecuted contract to reflect a change in execution date from September 15 to September 23, 1987. However, they inadvertently neglected to change the deadline date as well. The subsequent course of dealings between the parties (up until the point that the defendant decided not to go through with the sale) indicated that they both understood the correct deadline date to be December 23.

The parol evidence rule does not allow parties to use parol evidence to vary the plain terms of a written contract. There is an exception for situations where it can be proven that the written terms do not accurately reflect the intentions of the parties at the time of their contracting. *Id*. at 613; *see also Gulf Insurance Co. v. Construx, Inc.*, No. M1999-02803-COA-R3-CV, 2001 WL 840240 at *10 (Tenn. Ct. App. Jul 26, 2001) (no Tenn. R. App. P 11 application filed).

In *GRW,* the proof was overwhelming that the deadline date recited in the contract did not reflect a true meeting of the minds of the parties. They intended to create an option contract of ninety days duration, beginning on September 23, 1987, but an oversight on both their parts prevented the written contract from expressing this intention.

In the case before us, no drafting error was alleged, and the Buyer was aware from the very beginning that while it was entitled to pay for monthly extensions to its option rights, the number

of such extensions would be limited. There can be no doubt that the parties reached a meeting of the minds on both the Initial Contract and the Amended Contract. The Buyer's estoppel argument is based on conduct by the Sellers or their agent that occurred months after the Amended Contract was executed. For the reasons stated above, we have rejected that argument.

## IV.

The judgment of the trial court is affirmed. We remand this case to the Chancery Court of Davidson County for any further proceedings that may be necessary. Tax the costs on appeal to the appellants, J. Howard Johnson, George W. Holder, Jr., individually and/or As Attorney-In-Fact for Wesley Holder, III, and Robert F. Lance, all d/b/a Gateway Development.

_____
PATRICIA J. COTTRELL, JUDGE