# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE
November 19, 2013 Session

## ROBERT L. MACY v. OUIDA J. MACY

### Direct Appeal from the Chancery Court for DeKalb County
### No. 2011-CV-1      Ronald Thurman, Chancellor

### No. M2012-02370-COA-R3-CV - Filed February 11, 2014

This appeal challenges the effectiveness of a QDRO which requires Wife to pay taxes on a $115,000.00 divorce settlement. The trial court held that the amount should not be reduced by taxes. We conclude that the trial court erred in holding that Wife's $115,000.00 divorce settlement was not subject to reduction for taxes, and we reverse its holding in that regard. The case is remanded for further proceedings consistent with this opinion.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Stephen W. Pate, Murfreesboro, Tennessee, for the appellant, Robert L. Macy

Bratten H. Cook, II, Smithville, Tennessee, for the appellee, Ouida J. Macy

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Robert L. Macy ("Husband") and Ouida J. Macy ("Wife")[1] married in 1987. Husband filed a Complaint for Absolute Divorce in the Dekalb County Chancery Court on January 4, 2011 alleging irreconcilable differences and inappropriate marital conduct. Wife filed an Answer and Counter-Complaint conceding irreconcilable differences and alleging inappropriate marital conduct by Husband.

The divorce case was settled by mediation in June 2011. A Marital Dissolution Agreement ("MDA") was entered on August 29, 2011; Wife executed the MDA on July 11, 2011 and Husband executed the MDA on August 24, 2011. Pursuant to the MDA, Husband was awarded the parties' marital residence, 9.93 acres of land adjoining the marital residence property, and "two tracts of real property of approximately twenty three acres of land located in Dekalb County, Tennessee[.]" Wife was required to execute quitclaim deeds conveying her interest in the above-properties to Husband.

The MDA further provided:

> **2.5** As a division of marital property, the husband will pay to the wife the sum of $115,000.00, which shall be paid from his retirement account pursuant to paragraph 4.0 below, for any and all interest she has in the marital property which will become the property of the husband, included but not limited to, all of the realty ow[n]ed by the parties, and the husband's retirement account.[2]
>
> . . . .
>
> **4.0 PENSION/RETIREMENT ACCOUNTS:** Husband maintains a 401(k) account through his employment with Johnson Controls, with the present balance being approximately $200,000.00, after deducting the loans outstanding on said account in the amount of approximately $16,000.00. The parties agree that wife shall receive the total sum of one hundred fifteen

---

[1]Appellee's name is spelled both Ouida and Quida throughout the record. We will utilize the "Ouida" spelling used in Appellee's brief.

[2]The MDA also distributed personal property including motor vehicles and all-terrain vehicles. The MDA provided that Wife was entitled to all proceeds, if any, received from her pending workers' compensation claim and that she would be responsible for medical bills incurred for her injuries as well as for reimbursing medical expenses paid by Husband's health insurance provider.

thousand dollars ($115,000.00) from said 401(k) account, pursuant to the terms
of a qualified domestic relations order (QDRO). Wife shall be responsible for
the preparation of the QDRO or any other documents required to convey said
funds, and husband shall cooperate in providing all information and/or
executing any documents necessary to convey wife's portion in said account.
The parties shall be equally responsible for any administrative fees assessed
by the plan administrator to process the transfer pursuant to the terms of the
QDRO.

The MDA was incorporated into a Final Judgment, filed on September 6, 2011, which
dissolved the parties' marriage on the ground of irreconcilable differences. Also on
September 6, 2011, a Qualified Domestic Relations Order ("QDRO") was signed by the
parties and their counsel and filed in the chancery court. The QDRO provided in relevant
part:

**11. Taxation**
For purposes of Section 402 and 72 of the Code, any alternate payee who is the
spouse or former spouse of the participant shall be treated as the distributee of
any distributions or payments made to the alternate payee under the terms of
the order and, as such, will be required to pay the appropriate federal, state,
and local income taxes on such distributions.

On February 22, 2012, Wife filed a Motion in the chancery court, pursuant to
Tennessee Rule of Civil Procedure 70,[3] moving the court to "enforce the requirement set
forth in the Order heretofore entered in this cause on September 6, 2011 which required
[Husband] to pay to [Wife] the sum of $115,000.00 from []his retirement account."
According to the Motion, Wife had been "informed that the administrator for the employer
has set aside the $115,000.00 due the wife, but . . . that she will be responsible for the
payment of penalties and taxes on such amount, which would reduce the $115,000.00 to
approximately $90,000.00, which was not the agreement of the parties."

In response, Husband filed a Motion on April 17, 2012, pursuant to Tennessee Rule
of Civil Procedure 60.02, moving the court to order Wife to execute three quitclaim deeds

---

[3]In his appellate brief, Husband argues that Wife inappropriately relied upon Rule 70. However,
Husband does not list this as an issue for our review, and it is unclear whether this argument was raised in
the trial court. Therefore, we will not consider, on appeal, the appropriateness of Wife's reliance upon Rule
70. ***See Barnes v. Barnes***, 193 S.W.3d 495, 501 (Tenn. 2006) ("Issues that were not raised in the trial court
may not be raised for the first time on appeal."); ***Childress v. Union Realty Co., Ltd.***, 97 S.W.3d 573, 578
(Tenn. Ct. App. 2002) ("We consider an issue waived where it is argued in the brief but not designated as
an issue.") (citation omitted).

conveying her interest in the above-referenced properties to Husband consistent with the Final Judgment and the MDA. According to Husband, Wife had refused to relinquish her interest in the properties until she received the $115,000.00 sum unreduced by taxes. Husband argued that Wife was responsible for paying taxes on the amount, and in any event, that the requirement that she execute the quitclaim deeds was not contingent upon her receipt of funds.

A hearing was held on the parties' motions on May 4, 2012. At the hearing, the chancellor *sua sponte* raised the issue of whether additional consideration was given to Wife for her execution of the QDRO, which it found contained terms different from those set out in the MDA. The court allowed Husband's counsel ten days in which to file a statement of any consideration received by Husband subsequent to her execution of the MDA on July 11, 2011 and her execution of the QDRO filed on September 6, 2011. Husband responded on May 14, 2012 by filing a Notice in which he "concede[d] that he [was] unaware of any new or additional consideration directly benefitting wife between the date of her execution of the MDA and the date of the filing of the QDRO[;]" Husband, however, argued that Wife received consideration when she executed the MDA and that additional consideration was unnecessary.

On July 20, 2012, the chancery court entered an Order in which it found and ordered as follows:

> 1. That there was no new or additional consideration benefitting defendant/wife between the dates of the execution of the Marital Dissolution Agreement and the Qualified Domestic Relations Order. The plaintiff/husband was given the opportunity to present such evidence, and counsel for plaintiff/husband candidly admitted no such evidence existed.

> 2. That based upon the language of the Marital Dissolution Agreement, where it recites that "as a division of marital property, the husband will pay to the wife the sum of $115,000.00, which shall be paid from his retirement account . . .", the Court is of the opinion that said payment is in the nature of a division of marital property, and the plaintiff/husband was merely afforded an opportunity to pay same out of his retirement account, of which he received 100%.

> 3. The defendant/wife should receive the payment of $115,000.00 unreduced by any taxes, etc.

> 4. That in the event the plaintiff/husband does not agree to the payment

-4-

to the defendant/wife of $115,000.00 unreduced by taxes, etc., then the Court hereby sets aside the Marital Dissolution Agreement in its entirety and the Court will decide all issues related thereto absent a subsequent agreement by the parties.[4]

On August 3, 2012, Husband filed a Motion for Interlocutory Appeal regarding the taxation issue. In an October 16, 2013 Order, the chancery court denied Husband's motion and instead it ordered that its July 20, 2012 Order[5] be deemed a final order subject to appeal.[6] Husband filed a Notice of Appeal to this Court on October 19, 2013.[7]

## II. ISSUE PRESENTED

Husband presents the following issue for review:

1.  Whether the trial court erred in ordering Wife to receive the total sum of $115,000.00 net and unreduced by taxes, from Husband's 401(k) account.

For the following reasons, we reverse the decision of the chancery court and we remand for further proceedings.

---

[4]As noted below, this paragraph was later stricken by the court.

[5]The October 16, 2013 Order stated that it was amending a July 18, 2012 Order. We will refer to the July Order by its filing date of July 20, 2012 rather than by its execution date of July 18, 2012.

[6]In the October 16, 2013 Order, the chancery court also amended the July 20, 2012 Order by striking paragraph four in its entirety.

[7]On January 16, 2013, the chancery court entered an Order ordering, among other things, that Wife "shall not be required to execute the quit claim deeds to [Husband] . . . until there is a final resolution of the appeal filed by [Husband.]" In response to an Order of this Court directing entry of a final judgment, the record was supplemented with an Agreed Order, filed January 6, 2014, ordering that Wife "shall execute quitclaim deeds to [Husband] regarding the parties' real property, immediately upon the conclusion of the appeal by [Husband.]"

## III. DISCUSSION[8]

The sole issue on appeal is whether Wife's $115,000.00 divorce settlement is subject to reduction through taxation. As stated above, the trial court held that Wife should receive the entire $115,000.00 sum, unreduced by taxes. Ostensibly, the trial court reached this conclusion on two grounds: Wife did not receive additional consideration for her execution of the QDRO and, according to the trial court, the MDA provided for Wife's receipt of $115,000.00 and Husband "was merely afforded an opportunity to pay same out of his retirement account[.]"

On appeal, Husband argues that the plain language of the MDA and the QDRO clearly requires Wife to pay taxes on distributions from Husband's retirement account and that both documents should be enforced under general contract principles. He contends that both the MDA and the QDRO were entered into "with full disclosure, adequate provisions for each party, consideration by each party, without fraud or misrepresentation, with neither party being under undue influence or duress, and with each party having the right to seek independent advi[c]e."[9] Husband maintains that the MDA and the QDRO do not contain conflicting terms and he rejects the idea that additional consideration was necessary for execution of the QDRO because the QDRO was necessary to "effectuate[] the transfer of assets pursuant to the terms of the MDA."

In response, Wife does not argue that the MDA and/or the QDRO should be set aside for failure of consideration or because there was no meeting of the minds–theories considered *sua sponte* by the trial court. Instead, she argues solely that the MDA and the QDRO contain conflicting language and, therefore, that the MDA–which, according to Wife provides for a $115,000.00 award to Wife unreduced by taxes–controls.

---

[8]At the outset, we address Wife's argument in her appellate brief that Husband's appeal is untimely. Wife contends that the order appealed from is the Final Judgment entered on September 6, 2011, and therefore, that the appeal period lapsed on October 7, 2011, prior to Husband's Notice of Appeal in October 2012. Although Wife failed to properly raise this issue in her statement of issues presented for review, *see* T.R.A.P. 27(a)(4), we must, *sua sponte*, review the record to determine whether this Court properly possesses appellate jurisdiction. ***Davis v. Shelby County Sheriff's Dept.***, No. W2006-00980-COA-R3-CV, 2007 WL 609159, at *3 (Tenn. Ct. App. Feb. 28, 2007) (citing *Huntington Nat'l Bank v. Hooker*, 840 S.W.2d 916, 922 (Tenn. Ct. App. 1991)). We conclude that the Order appealed from was entered on October 16, 2012, and therefore, that Husband's October 19, 2012 Notice of Appeal was timely filed.

[9]Wife does not argue otherwise. As stated below, Wife merely argues that the QDRO contains language in conflict with the terms of the MDA, and therefore, that the MDA controls.

In Tennessee, an MDA incorporated into a final decree of divorce "is a contract which is binding on the parties and as such it is 'subject to the rules governing construction of contracts.'" ***Stiel v. Stiel***, 348 S.W.3d 879, 885 (Tenn. Ct. App. 2011) (quoting *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn. 2001)). "'When resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language.'" ***Johnson***, 37 S.W.3d at 895 (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). This interpretation is not possible where ambiguity exists with regard to material terms; however, ambiguity "'does not arise in a contract merely because the parties may differ as to interpretations of certain of its provisions.'" ***Id.*** (quoting *Cookeville Gynecology & Obstetrics, P.C. v. Southeastern Data Sys., Inc.*, 884 S.W.2d 458, 462 (Tenn. Ct. App. 1994)). "'A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one.'" ***Id.*** (quoting *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)). The interpretation of a contract is a question of law, and therefore a trial court's interpretation is not entitled to a presumption of correctness on appeal.[10] ***Pylant v. Spivey***, 174 S.W.3d 143, 150 (Tenn. Ct. App. 2003) (citations omitted).

The middle section of this Court has previously held that a QDRO expressly incorporated into an MDA–where the MDA was incorporated into the final divorce decree–and contemporaneously executed and entered with the final decree "must be treated as part of the parties['] agreement to divide the marital property." ***Pruitt v. Pruitt***, 293 S.W.3d 537, 543 (Tenn. Ct. App. 2008) (holding that the MDA and the initial QDRO–rather than a subsequent QDRO–which were incorporated into the Final Decree of Divorce, governed the rights and responsibilities of the parties) (citing *Thornton v. Thornton*, 277 Mich. App. 453, 746 N.W.2d 627, 629-30 (2007) (holding the provisions of the contemporaneous QDRO must be treated as part of the settlement because the parties approved the content of the judgment of divorce at the same time they approved the initial QDRO referred to by the judgment of divorce)) (footnote omitted). We have similarly held that a QDRO contemporaneously entered with a final divorce decree either merges into the divorce decree or is eliminated if it conflicts with the decree. ***See Davidson v. Davidson***, 916 S.W.2d 918, 922 (Tenn. Ct. App. 1995); *see also Pruitt*, 293 S.W.3d at 544 ("[P]arties may not amend the terms of the property division in a final judgment by a *subsequent* agreement, such as a QDRO." (citations omitted) (emphasis added)). In considering merger/elimination of a QDRO, this Court previously considered the following contract principles:

---

[10]Similarly, the interpretation of a judgment–for example, a final decree of divorce–is a question of law. ***Pruitt***, 293 S.W.3d at 544. "We are to construe judgments as we do other written instruments, and the determinative factor is the intention of the court as collected from all parts of the judgment. The construction of a judgment should give force and effect to every word of it, if possible, and make all of the parts consistent, effective, and reasonable." ***Id.*** at 544-45 (citations omitted).

It is a well-recognized principle of contract construction that the intention of the parties as ascertained from the entire context of their agreement is controlling. And where an executed agreement refers to other documents and makes their conditions part of the executed agreement, the documents must be interpreted together as the agreement of the parties.

. . . .

It is the universal rule that a contract must be viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another.'" *Id.* (quoting *Associated Press v. WGNS, Inc.*, 48 Tenn. App. 407, 348 S.W.2d 507 (1961)).

. . . .

Taking its words in their ordinary and usual meaning, no substantive clause must be allowed to perish by construction, unless insurmountable obstacles stand in the way of any other course. Seeming contradictions must be harmonized if that course is reasonably possible. Each of its provisions must be considered in connection with the others, and, if possible, effect must be given to all. A construction which entirely neutralizes one provision should not be adopted if the contract is susceptible of another which gives effect to all of its provisions. The courts will look to the entire instrument, and, if possible, give such construction that each clause shall have some effect, and perform some office.

*Id.* (quoting *Engert v. Peerless Ins. Co.*, 53 Tenn. App. 310, 382 S.W.2d 541 (1964); *Associated Press v. WGNS, Inc.*, 48 Tenn. App. 407, 348 S.W.2d 507 (1961)).

To determine the effectiveness of the QDRO in this case–which undisputedly calls for Wife to pay taxes on distributions from Husband's 401(k) account– a review of the operative documents is in order. As set forth above, the MDA, which was entered on August 29, 2011, and which was expressly incorporated into the Final Judgment, provided in relevant part:[11]

**2.5** As a division of marital property, the husband will pay to the wife the sum of $115,000.00, which shall be paid from his retirement account pursuant to paragraph 4.0 below, for any and all interest she has in the marital property

---

[11]Again, Wife executed the MDA on July 11, 2011 and Husband executed the MDA on August 24, 2011.

which will become the property of the husband, included but not limited to, all of the realty ow[n]ed by the parties, and the husband's retirement account.

. . . .

**4.0 PENSION/RETIREMENT ACCOUNTS:** Husband maintains a 401(k) account through his employment with Johnson Controls, with the present balance being approximately $200,000.00, after deducting the loans outstanding on said account in the amount of approximately $16,000.00. The parties agree that wife shall receive the total sum of one hundred fifteen thousand dollars ($115,000.00) from said 401(k) account, pursuant to the terms of a qualified domestic relations order (QDRO). Wife shall be responsible for the preparation of the QDRO or any other documents required to convey said funds, and husband shall cooperate in providing all information and/or executing any documents necessary to convey wife's portion in said account. The parties shall be equally responsible for any administrative fees assessed by the plan administrator to process the transfer pursuant to the terms of the QDRO.

The QDRO, which was referenced in the MDA and entered contemporaneously with the Final Judgment,[12] provided in pertinent part:

**11. Taxation**
For purposes of Section 402 and 72 of the Code, any alternate payee who is the spouse or former spouse of the participant shall be treated as the distributee of any distributions or payments made to the alternate payee under the terms of the order and, as such, will be required to pay the appropriate federal, state, and local income taxes on such distributions.

As noted above, on appeal, Wife contends that the MDA and the QDRO contain conflicting language. Specifically, she focuses upon the phrase "As a division of marital property," and she seems to suggest that this phrase indicated an intent that her $115,000.00 award not be subject to reduction through taxation. Thus, she contends that because the QDRO subjects her award to reduction, a conflict exists, and, therefore, we must disregard the QDRO. We disagree.

---

[12]The record indicates that both the Final Judgment and the QDRO were filed in the chancery court at 9:55 A.M. on September 6, 2011. The QDRO was signed by Husband, Wife, and their respective counsel, and the Final Judgment was approved for entry by both parties' counsel.

Although the MDA, itself, did not expressly state that Wife would be responsible for paying taxes on any distribution from Husband's 401(k) account, the converse–that Wife would *not* be responsible for the payment of taxes–likewise, was not expressed. Wife has cited no authority, nor have we found any, to support her apparent assertion that an award made as a "division of marital property" is necessarily not subject to reduction through taxation.[13] The MDA did not apportion any tax consequences resulting from distributions from Husband's retirement account. Instead, it expressly provided that Wife's award would be made "pursuant to the terms of a qualified domestic relations order (QDRO)" and such QDRO was contemporaneously entered with the Final Judgment to provide the missing details. Pursuant to the unambiguous terms of the QDRO, Wife is "required to pay the appropriate federal, state, and local income taxes" on distributions from Husband's 401(k) account.

Because the QDRO was expressly incorporated into the MDA–and thus the Final Judgment–because it was contemporaneously entered with the Final Judgment, and because it complements the terms of the MDA, the QDRO must be treated as part of the parties' agreement to divide the marital property. *See Pruitt*, 293 S.W.3d at 542-43. Read together, the QDRO and the MDA unambiguously provide for the payment of $115,000.00 to Wife from Husband's 401(k) account, subject to reduction for appropriate federal, state, and local income taxes. Accordingly, we find the trial court erred in holding that Wife's $115,000.00 divorce settlement was not subject to reduction for taxes, and we reverse its holding in that regard. The case is remanded for further proceedings consistent with this opinion.

---

[13]Wife argues in her brief that "the most telling evidence regarding the intent of the parties[] has to do with the initial 'draft' Marital Dissolution Agreement submitted by counsel for husband, and rejected by counsel for wife. Counsel for wife sent to counsel for husband the appropriate language that was to be included in the Marital Dissolution Agreement clearly evidencing the fact that the $115,000.00 due the wife was a <u>division of marital property</u>, not simply an award from his retirement account." Again, Wife has cited no authority that a "division of marital property" is necessarily without tax consequences, and in any event, unexecuted drafts and correspondence between the parties may not properly be considered where, as here, the contract language is unambiguous. *See Marcum v. Ayers*, 398 S.W.3d 624, 629 (Tenn. Ct. App. 2012).

## V.    CONCLUSION

For the aforementioned reasons, we reverse the decision of the chancery court and we remand for further proceedings.  Costs of this appeal are taxed to Appellee, Ouida J. Macy, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.